UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| Ebony Parker, | Case No. 17-cv-3844 (SER) |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Ebony Parker ("Parker") seeks review of the Acting Commissioner of Social Security's (the "Commissioner") denial of her application for supplemental security income ("SSI"). *See* (Compl. for Judicial Review of Decision of the Comm'r of Soc. Sec., "Compl.") [Doc. No. 1]; (Admin. R.) [Doc. Nos. 13–20 at 291]. The parties filed cross-motions for summary judgment. (Pl.'s Mot. for Summ. J.) [Doc. No. 21]; (Def.'s Mot. for Summ. J.) [Doc. No. 23]. For the reasons set forth below, the Court denies Parker's Motion for Summary Judgment and grants the Commissioner's Motion for Summary Judgment.

I. BACKGROUND

A. Procedural History

Parker filed for DIB on July 1, 2013, citing an alleged onset date ("AOD") of October 1, 2012. (Admin. R. at 291). Parker's application identified disabilities due to lupus. (*Id.* at 314). Parker's claims were denied initially and upon reconsideration. (*Id.* at 146, 159). Following three hearings and the submission of supplemental records, the administrative law judge (the "ALJ")

denied benefits to Parker on June 16, 2016. (*Id.* at 11–32). The Appeals Council denied Parker's request for review, rendering the ALJ's decision final. (*Id.* at 1); *see* 20 C.F.R. § 416.1481. Parker initiated the instant lawsuit on August 21, 2017. (Compl.).

Parker makes three arguments: (1) the ALJ ignored four factors that explain Parker's non-compliance with treatment; (2) the ALJ "cherry-picked" evidence evaluating Parker's credibility; and (3) the testifying medical experts did not address conflicting evidence in the record. *See* (Mem. in Supp. of Pl.'s Mot. for Summ. J., "Parker's Mem. in Supp.") [Doc. No. 22 at 37–44].

### B. Factual Background

The majority of the Administrative Record, which spans more than 8,000 pages, consists of medical records of Parker's numerous emergency room visits, hospital stays, and clinic appointments related to her diagnosis of systemic lupus erythematosus ("SLE" or "lupus") and associated symptoms and complications. *See, e.g.*, (Admin. R. at 429). SLE is "an inflammatory connective tissue disease with variable features." *Systemic lupus erythematosus* 515390, Stedman's Medical Dictionary, Westlaw (database updated Nov. 2014). The Court reviewed the entire Administrative Record, but summarizes only the testimony of Parker and the relevant medical experts when appropriate. The records are discussed in more detail in the analysis of this Order.

#### 1. Parker's Background and Testimony

On her AOD, Parker was eighteen years old, making her a younger individual. *See* (Admin. R. at 291); 20 C.F.R. § 416.963(c).

Parker has never worked and did not graduate from high school. (Admin. R. at 81, 96). She receives medical assistance and food support through the county. (*Id.* at 96). She testified lupus causes fevers, joint pain, kidney problems, and frequent hospitalizations. (*Id.* at 97). During these

2

hospitalizations, she is treated with steroids and painkillers most often. (*Id.* at 100). About half of the time, she is treated with antibiotics. (*Id.*). Initially, Parker testified in July 2015 that she was taking prednisone[1] and Plaquenil[2] as directed. (*Id.* at 102). Sometimes she forgets to take her medicine, but she gets sick regardless. (*Id.* at 117); *see also* (*id.* at 61). In April 2016, she testified that she stopped taking Plaquenil because it made her vision blurry. (*Id.* at 61). She also testified that she stopped taking all her medication, including prednisone, in November 2015 because she was depressed and did not want to take it anymore. (*Id.* at 62); *see also* (*id.* at 63). She testified that she knows that she is supposed to take her medicine to prevent flares, but the medicine does not always help. (*Id.* at 62–64).

On days when Parker is not hospitalized, she is able to go for walks, care for herself, and cook. (*Id.* at 104); *see also* (*id.* at 322) (function report); *but see* (*id.* at 339) (another function report stating she does not cook). She said she has memory problems. (*Id.* at 103, 117).

Parker testified that she stopped drinking in October 2015, but before that she "drank all the time," meaning almost every day. (*Id.* at 119, 125). She took the bus to various liquor stores, where her friends or family members would buy alcohol for her. (*Id.* at 122–23). She smokes marijuana every day. (*Id.* at 65).

### 2. Dr. Steiner's Testimony

Andrew Steiner, MD ("Dr. Steiner"), testified at the third hearing before the ALJ on April 20, 2016. *See* (Admin. R. at 56–57, 68). He testified that Parker's impairments did not satisfy

---

[1] Prednisone is a corticosteroid that works on the immune system to relieve inflamed areas of the body. *Prednisone (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/description/drg-20075269 (last updated Mar. 1, 2017).

[2] Plaquenil is the brand name of hydroxychloroquine, which is used to help control lupus symptoms. *Hydroxychloroquine (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydroxychloroquine-oral-route/description/drg-20064216 (last updated Mar. 1, 2017).

3

Listing 14.02 (systemic lupus erythematosus). *See* (*id.* at 70–71). He noted that the record contained "repeated reference to non-compliance" in the form of "either missing appointments or not taking medicines as prescribed." (*Id.* at 70). More specifically, he said that "we don't know what [Parker would] be like if she took her medication on a regular basis, and followed her doctors' advice in regards to managing her condition." (*Id.* at 73). Dr. Steiner testified that a sedentary job that did not include lifting, time on feet, environments with high concentrations of pollutants would be appropriate, and testified that he did not know if Parker could be restored to such a condition that she would be able to work. (*Id.* at 71, 73).

### 3. Dr. Lace's Testimony

Michael Lace, PsyD ("Dr. Lace"), also testified at the April 20, 2016 hearing. (Admin. R. at 56–57). He said Parker's activities of daily living are moderately restricted, she has marked difficulties in maintaining social function, and marked difficulties in maintaining concentration, persistence, or pace. (*Id.* at 77–78). If Parked stopped her substance use, Dr. Lace testified she would have mildly restricted activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 78). Dr. Lace testified that Parker should be "limited to simple, routine, repetitive types of tasks" and demands that are "no greater than very brief, very superficial contact with all groups, co-workers, the general public, as well as supervisors." (*Id.* at 79). Additionally, Parker should be limited to "a work setting where there's no access to or contact with prescription medications, alcohol, or illegal drugs." (*Id.*).

4

### C. The ALJ's Decision

Consistent with the Social Security Administration's regulations, the ALJ conducted the five-step eligibility analysis. (Admin. R. at 11–32); *see* 20 C.F.R. § 416.920(a)(4). The ALJ found that Parker had the following severe impairments:

> alcohol use/cannabis use disorder; mood disorder, not otherwise specified (NOS)/depression (NOS); post-traumatic stress disorder (PTSD); adjustment disorder/generalized anxiety disorder; psychotic disorder NOS; anti-social personality disorder; mild cognitive disorder; systemic lupus erythematosus and residual effects; asthma; right shoulder acromioclavicular (AC) joint separation; avascular necrosis; and obesity.

(*Id.* at 14) (citation omitted). The ALJ found Parker's impairments, including substance use disorders, met Listings 12.04 (depressive, bipolar and related disorders) and 12.09 (substance addiction disorders).[3] (*Id.*). If Parker stopped her substance use, however, the ALJ found that her impairments or combination of impairments would not meet or medically equal any of the Listings.[4] (*Id.* at 16). In making this determination, the ALJ considered the following Listings: 1.02 (major dysfunction of a joint); 3.03 (asthma); 12.02 (neurocognitive disorders), 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04, 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), 12.09, and 14.02 (systemic lupus erythematosus). (*Id.* at 16–20). The ALJ also considered Parker's obesity using the criteria of the musculoskeletal, respiratory, and cardiovascular Listings. (*Id.* at 16).

The ALJ found that if Parker stopped her substance use, she would have the residual functional capacity ("RFC") to perform sedentary work with the following additional limitations:

---

[3] The Listings cited in this Order refer to the version in effect on the date of the ALJ's decision.

[4] Under the Social Security Act, "an individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J).

5

> no exposure to high concentrations of pollutants such as dust, odors, fumes, gases and those types of pulmonary irritants; no exposure to temperature extremes; as well as simple, routine, repetitive tasks and instructions further defined as consistent with repetitive short-cycle type work . . . , tasks and instructions that would involve minimal, if any, workplace changes in terms of tools, work processes, industry and setting, occasional very brief, very superficial contact with coworkers, supervisors, and the public . . . , and no access to or contact with prescription medications, other than her own, alcohol or drugs in the work environment.

(*Id.* at 20–21). The ALJ found that Parker had no past relevant work and that there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 30–32). Therefore, the ALJ concluded that Parker was not disabled. (*Id.* at 32).

## II. DISCUSSION

### A. Legal Standard

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by substantial evidence in the record as a whole." *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (internal quotation marks omitted). The Court's task is limited "to review[ing] the record for legal error and to ensur[ing] that the factual findings are supported by substantial evidence." *Id.* This Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).

A court cannot reweigh the evidence or "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [a court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

B. Analysis

1. Credibility

a. ALJ's Decision

The ALJ began her credibility analysis by noting that "[o]verall, this record contains immense inconsistencies." (Admin. R. at 22). The ALJ noted that Parker's treatment included taking medications such as prednisone, hydrocodone, and Plaquenil, "which have been taken sporadically at best."[5] (*Id.*). The ALJ noted that Parker testified that she stopped taking all of her medications because she felt they were not working and gave her blurry vision. (*Id.*). Parker almost exclusively sought treatment at Hennepin County Medical Center ("HCMC") for symptoms related to lupus. (*Id.*). Additionally, Dr. Steiner testified that the result of several laboratory tests and examinations were "grossly normal," and stated that "the record was problematic because of the pattern of medical non-compliance having to do with either not taking her prescribed medications or missing medical appointments." (*Id.* at 23). Dr. Steiner testified that Parker's lupus affected other organ systems less than Parker alleged, as evidenced by normal creatinine kinase levels, normal ranges of motion and intact strength in Parker's arms and legs with only minor swelling, normal skin tone, and stable nephritis and renal function.[6] (*Id.*).

The ALJ noted that Parker's lupus "has been described as well-controlled with only moderate doses of corticosteroids," and Parker has not developed the major cardiac or lung complications often associated with lupus. (*Id.* at 23–24). X-rays and CT scans of organs were

---

[5] Hydrocodone is a narcotic analgesic used to treat severe pain by acting on the nervous system. *Hydrocodone (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydrocodone-oral-route/description/drg-20084881 (last updated Mar. 1, 2017).

[6] Nephritis is inflammation of the kidneys. *Nephritis* 591550, Stedman's Medical Dictionary, Westlaw (database updated Nov. 2014).

normal. (*Id.* at 24). Despite Parker's allegation that she can only walk one block before needing to rest and despite stating that she needs a cane, the medical records reflect a normal gait. (*Id.*).

The ALJ also commented on Parker's frequent use of the hospital, instead of a clinic, including at times visiting the hospital almost daily. (*Id.*). Not all of Parker's hospital visits were medical emergencies. (*Id.*). The records reflect possible malingering, seeking hospital admission due to homelessness or other social stressors, refusing to leave the hospital, and refusing to explain why she was at the hospital. (*Id.*).

Medications helped control Parker's symptoms. (*Id.* at 25). In support, the ALJ noted that both medical records and Parker's own testimony stated that steroids helped, and an anti-inflammatory medication continued to be prescribed, suggesting its effectiveness. (*Id.*). The ALJ conceded that Parker claimed the medications caused side effects and stopped taking them as a result, but noted that she did not complain of side effects during medical visits. (*Id.*). Further, the side effects did not cause any additional limitations. (*Id.*). The ALJ found that "the level of treatment has not been nearly what one would expect given the complaints of disabling mental health symptoms." (*Id.*).

The ALJ noted that "mental status exams, cognitive testing, and [Parker's] ability to manipulate the emergency rooms to get her basic needs met show that she has . . . the requisite level of insight and understanding." (*Id.*). Parker testified that she understood why she was supposed to take her medications and "stated that they helped keep her lupus condition from flaring." (*Id.*). Parker gave several reasons for not taking her medication that are not related to her

mental health symptoms, such as transportation issues, side effects, she did not like them, she wanted to be pregnant, and she lacked a state identification card.[7] (*Id.*).

The ALJ also noted that despite Parker's diagnoses of "multiple mental impairments, including depression, posttraumatic stress disorder, adjustment disorder/generalized anxiety disorder; psychotic disorder, not otherwise specified, mild cognitive disorder, and an antisocial personality disorder[,]" Parker refuses to see a psychiatrist or take medication consistently. (*Id.* at 27).

### b. Legal Standard

"If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). "The crucial question is not whether [the claimant] experienced pain, but whether [the claimant's] credible subjective complaints prevent him from performing any type of work." *Id.* at 713–14. Subjective complaints may be discounted if they are inconsistent with the evidence as a whole. *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007). Because "[t]he ALJ is in the best position to determine the credibility of the testimony," the court defers to an ALJ's decisions on credibility. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). The ALJ cannot only rely on the lack of objective medical evidence in making his or her conclusion. *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), identifies the factors governing a credibility determination. In assessing subjective complaints of pain, an ALJ must consider several

---

[7] The ALJ also noted that some of these reasons were not hinderances. Specifically, the record demonstrated that Parker knew how to schedule transportation and how to use public transportation. (Admin. R. at 26). Further, Parker ultimately obtained her identification card in December 2015. (*Id.*).

9

factors including: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322); *see also* 20 C.F.R. § 416.929(c) (discussing how intensity and persistence of symptoms are evaluated and referring to factors that mirror the *Polaski* factors). Other relevant factors are the claimant's work history and objective medical evidence. *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999).

### c. Credibility Analysis

Parker argues the ALJ erred in her credibility analysis of Parker in two ways: First, Parker argues that the ALJ ignored explanations regarding why Parker failed to follow prescribed treatment. (Parker's Mem. in Supp. at 37). Second, Parker argues the ALJ "cherry-picked" evidence related to Parker's credibility and "wholly ignores the ongoing debate . . . about Parker's mental capacity to understand, consent to, and comply with treatment." (*Id.* at 42).

#### i. Explanations for Noncompliance

Parker identifies four mitigating factors the ALJ ignored that explain Parker's failure to follow treatment. (*Id.* at 37). The Court concludes that the ALJ explicitly considered all but one of these factors and substantial evidence supports her decision that Parker failed to follow prescribed treatment.

First, Parker identifies ten places in the Administrative Record where treatment providers "expressed doubts that Parker could independently manage her own medical care and treatment."

(*Id.* at 38–40)[8] (citing Admin. R. at 763, 808, 1108, 1122, 1129, 1419, 1442, 1461, 2372, 5731); *see also* (*id.* at 4952). As Parker points out, "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (cleaned up). The ALJ, however, considered this exact reason for noncompliance and rejected it. *See* (Admin. R. at 26). For example, the ALJ noted that Parker had normal mental status exams. (*Id.*); *see also* (*id.* at 6970, 7069, 7083, 7091, 7103, 7184). The ALJ agreed that cognitive testing showed memory issues and accommodated that limitation in the RFC by limiting Parker to "routine, repetitive, and fixed and predictable tasks." (*Id.* at 30) (citing *id.* at 4955); *see also* (*id.* at 26). The ALJ noted that not all of Parker's emergency room visits were medically necessary. (*Id.* at 24) (citing 2285, 3208, 5028, 6466, 6841). Additionally, during one of the hearings, Parker testified that she understood why she was supposed to take her medication and stated that her medication helps her. (*Id.* at 62). Thus, although Parker's citations support her assertion, the ALJ's decision is also supported by substantial evidence.

Second, Parker argues that side effects caused by prednisone, including a compromised immune system, resulted in several hospital admissions, in addition to other side effects mentioned in the record. (Parker's Mem. in Supp. at 40) (citing Admin. R. at 587, 691, 710, 1108, 1121, 1272, 1678, 1680, 2331, 2643, 4687, 5441, 6185, 6650). Contrary to Parker's assertions, the ALJ did not ignore the side effects of prednisone. Instead, she acknowledged that Parker testified that she stopped taking her medications because they did not always work and because Plaquenil made her

---

[8]  Some of Parker's citations to the Administrative Record do not support the referenced proposition. Nonetheless, all of Parker's assertions are supported elsewhere in the record. For the sake of clarity, the Court has cited the pages where the assertion can be found, rather than strictly adhering to Parker's citations.

vision blurry. (Admin. R. at 26) (referring to *id.* at 61–64, 6927). Additionally, the ALJ found—as stated above—that Parker did not complain of side effects to providers and any side effects would not cause additional limitations. (*Id.* at 26). The ALJ's position is supported by the record. *See, e.g.*, (*id.* at 2144) (noting no side effects with medications); (*id.* at 6981) (reporting that Parker is compliant with taking her medications and is feeling well).

Third, Parker describes various places in the record where providers stated that "steroids were often ineffective at treating Parker's condition." (Parker's Mem. in Supp. at 41) (citing Admin. R. at 1415, 1680, 1943). While Parker is correct, the ALJ correctly noted that Parker's lupus "has been described as well-controlled with only moderate doses of corticosteroids." (Admin. R. at 25) (citing *id.* at 6901). The record shows both that steroids may have been ineffective, as Parker's citations show, and that steroids appeared to be effective when taken as directed, as the ALJ's citations show.

Finally, Parker argues at times, it was impossible for her take her medication due to vomiting and that she missed some appointments due to hospitalization. (Parker's Mem. in Supp. at 41–42) (citing Admin. R. at 613, 727, 730, 3771, 4359, 4687, 5293, 5297, 7941). Although the ALJ referenced Parker's missing appointments, the reference appears to be made in passing with respect to Parker's overall compliance with treatment. *See* (Admin. R. at 26). And, as stated above, the ALJ noted that several of Parker's own explanations, such as issues with transportation and identification, were not persuasive. *See* (*id.*); *see also Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006) (stating that "[t]he fact that the ALJ did not elaborate on [a] conclusion does not require reversal, because the record supports [the] overall conclusion").

Overall, Parker's arguments accurately cite the record, but substantial evidence also supports the ALJ's conclusion. Because the Court may not reweigh the evidence, the ALJ's determination is not erroneous. *See Harwood*, 186 F.3d at 1042.

### ii. Overall Credibility

Parker's second argument regarding credibility claims that the ALJ "ignore[d] the ongoing debate . . . about Parker's mental capacity to understand, consent to, and comply with treatment, failing to reference nine of ten opinions that expressed these concerns." (Parker's Mem. in Supp. at 42). Parker also argues that the ALJ did not reconcile conflicting evidence and instead made "catty statements" about Parker's use of the emergency room. (*Id.* at 43). Finally, Parker asserts that the ALJ's credibility assessment focused too heavily on Parker's noncompliance with medication and treatment. (*Id.*).

The Court addressed Parker's arguments regarding her mental illness's impact on her treatment compliance and the ALJ's failure to reconcile conflicting evidence above. Although the ALJ commented about Parker's use of the emergency room, the ALJ's opinion, as cited above is supported by the record. *See* (Admin. R. at 24) (citing, *inter alia*, *id.* at 2285, 2297, 3208, 5425, 6466, 6841). In other words, while Parker undoubtedly needed emergency services at times, some records—cited by the ALJ—demonstrate that not every visit was required.

In addition to discussing the effectiveness and side effects of medication, the ALJ considered several other *Polaski* factors. The ALJ noted that Parker has daily activities such as "providing care for minor children, reading, listening to music, using public transportation to navigate the local metropolitan community, using a telephone and computer to talk with people, [u]sing Facebook, using a computer to purchase consumer goods, cooking, watching television and movies, and applying for housing assistance." (*Id.* at 19). The ALJ considered Parker's

neurological evaluation, which is objective medical evidence. (*Id.*). Contrary to Parker's assertion, the ALJ acknowledged "the presence of memory issues" and explained that she limited Parker's RFC "to routine, repetitive, and fixed and predictable tasks and instructions" consistent with that evaluation and Parker's daily functioning. (*Id.* at 30); *cf.* (Parker's Mem. in Supp. at 42–43) (stating that "the ALJ fail[ed] to identify the conclusion . . . that Parker has severe verbal memory deficits and severe limitations in retaining new information" (internal quotation marks omitted)). The ALJ also noted that Parker has never worked, which she said "raises a question as to her motivation to work and whether [Parker's] continuing unemployment is actually due to medical impairments or could be attributable to some other reason." (Admin. R. at 28). As stated above, a claimant's work history is relevant to a claimant's credibility. *See Haggard*, 175 F.3d at 594.

The Court concludes the ALJ's decision regarding credibility is supported by substantial evidence in the record as a whole.

### 2. Dr. Steiner's and Dr. Lace's Opinions

Parker also argues that Dr. Steiner's and Dr. Lace's opinions are not entitled to great weight. (Parker's Mem. in Supp. at 44–45); *see also* (Admin. R. at 29) (assigning great weight to Dr. Steiner "for his testimony and the evidence he cited to support his assessment of the physical impairments and his medical opinion about the associated functional limitations, which he categorized as not disabling and within the modified sedentary residual functional capacity"); (Admin. R. at 30) (assigning great weight to Dr. Lace's opinion regarding Parker's mental limitations and the evidence he cited). Specifically, Parker argues that Dr. Steiner did not address records that state that Parker's lupus does not respond to steroids, records that might mitigate Parker's noncompliance, and records of hospitalizations that occurred despite or even because of medication compliance. (Parker's Mem. in Supp. at 44–45). Similarly, Parker argues that Dr. Lace

ignored almost all of the medical records that address "Parker's capacity to understand her medical care[,] . . . any of the narrative of the psychiatric assessments[,]" and the "neuropsych testing." (*Id.* at 45) (citations omitted).

Generally, the opinion of a medical source who has not examined a claimant—such as Dr. Steiner and Dr. Lace—is entitled to less weight than the opinion of an examining medical source. 20 C.F.R. § 416.927(c)(1). Nonetheless, several other factors are considered in weighing a medical source's opinion, including whether the opinion is supported, whether the opinion is consistent with the record as a whole, and whether the source is a specialist. § 416.927(c)(3)–(5).

Here, the ALJ accorded Dr. Steiner's opinion great weight because he is a specialist in physical medicine and rehabilitation "who is familiar with the standards under which disability is determined for Social Security benefits," he relied on an examination of the full record, and his testimony is consistent with the evidence in the record. (Admin. R. at 29). The ALJ found Dr. Lace's opinion was consistent with the evidence he cited, and Dr. Lace used his "expertise and specialized knowledge of assessing mental impairments and resulting limitations within Social Security administration's disability analysis." (*Id.* at 30). The ALJ's reliance on Dr. Steiner's and Dr. Lace's opinions was one factor that the ALJ considered along with Parker's testimony, function reports, medical records, and objective testing. *See Kirchner v. Colvin*, No. 12-cv-1331 (JRT/SER), 2013 WL 5274469, at *16 (D. Minn. Sept. 18, 2013) (Tunheim, J., adopting the report and recommendation of Rau, Mag. J.) ("An ALJ may rely on a nonexamining physician's opinion as one factor in determining RFC when the ALJ has considered all of the evidence in the record." (citing *Casey*, 503 F.3d at 697; *Masterson v. Barnhart*, 363 F.3d 731, 739 (8th Cir. 2004))). Additionally, and as has already been explained, the Administrative Record in this case contains a great deal of conflicting evidence. The ALJ—not the testifying medical experts—must "weigh

conflicting evidence." *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007). Finally, the Court notes that Parker's counsel questioned both Dr. Steiner and Dr. Lace and could have followed up with both witnesses on any testimony counsel found incomplete. *See* (Admin. R. at 72–73, 80). The Court concludes that the ALJ's decision to assign great weight to the medical opinions of Dr. Steiner and Dr. Lace was not erroneous.

### 3. Summary

In sum, the Court concludes that none of Parker's arguments warrant remand to the Social Security Administration. While the voluminous Administrative Record contains evidence that supports Parker's assertions, the ALJ's conclusion is supported by substantial evidence in the record a whole. Regardless of whether this Court may have reached a different conclusion, the Court may not reweigh the evidence. *See Harwood*, 186 F.3d at 1042.

## III. CONCLUSION

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Ebony Parker's Motion for Summary Judgment [Doc. No. 21] is **DENIED**;

2. The Acting Commissioner of Social Security's Motion for Summary Judgment [Doc. No. 23] is **GRANTED**; and

3. This case is **DISMISSED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: September 4, 2018

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge